**STATE ex rel. Josephine M. WOYTUS, Plaintiff–Relator,**

v.

**Honorable Brendan RYAN, Judge, Circuit Court of the City of St. Louis, Respondent.**

No. 71134.

Supreme Court of Missouri, En Banc.

Sept. 8, 1989.

---

Ray A. Gerritzen, Michael A. Gerritzen, St. Louis, for plaintiff-relator.

Ross T. Anderson, Kemper R. Coffelt, Clayton, for respondent.

COVINGTON, Judge.

Relator Josephine Woytus, plaintiff in a personal injury action, instituted a proceeding in prohibition in the Missouri Court of Appeals, Eastern District, seeking to prohibit respondent trial judge, the Honorable Brendan Ryan, from compelling her to execute medical authorizations allowing defendants in the underlying suit to have *ex parte* discussions with relator's treating physicians. The court of appeals issued a preliminary writ of prohibition. In making the writ absolute, the court of appeals (Smith, J. dissenting) distinguished but affirmed the general holding of *State ex rel. Stufflebam v. Appelquist,* 694 S.W.2d 882 (Mo.App.1985), which entitled attorneys for defendant to obtain by court order authorization from the plaintiff to interview privately the plaintiff's treating physician. This Court granted transfer. By this opinion this Court abrogates the decision in *Stufflebam* and makes the writ of prohibition absolute.

Relator's underlying suit for personal injuries arose out of an automobile accident on August 18, 1984. Defendants in the suit are Linda Mattingly, driver of the other vehicle in the accident (and an uninsured motorist at the time of the collision), and American Manufacturer's Mutual Insurance Company, with whom relator had a liability insurance policy. Relator's claim against the insurance carrier is based upon an allegation of uninsured motorist coverage under the policy.

Dr. M. Robert Hill and Dr. John Arnot treated relator for the injuries she sustained in the accident. In response to defendant's interrogatories, relator identified these doctors as treating physicians and, further, as expert witnesses who would testify at trial as "[d]octors who examined and treated me [and] will testify to the injuries I received in this collision." Although defendants scheduled depositions of the doctors in March, 1988, depositions were not taken.

On April 1, 1988, defendants sought orders compelling plaintiff to authorize the doctors to discuss relator's physical and mental condition privately with defendants. The motions sought orders under the authority of *Stufflebam v. Appelquist.* Respondent denied the motions as phrased but granted defendants leave to file amended motions praying that the trial court compel relator to execute authorizations allowing the doctors to speak privately to defendants' attorneys. Defendants filed amended motions after which respondent ordered relator to execute medical authorizations to permit private discussions "as per Exhibit 3 contained at 694 S.W.2d at 884 in the case of *Stufflebam v. Appelquist ...,* unless prohibited by an appellate court." The authorizations provide:

I hereby authorize you to furnish and discuss with Coffelt & Coffelt, P.C., any and all information and records you have

concerning treatment rendered to me for one or all of the following injuries:

[parts of body and claimed conditions described]

This medical authorization does not require you to engage in discussions with Coffelt & Coffelt, P.C.; however, it does permit such discussions if you so desire.

In response, relator instituted this proceeding in prohibition.

Respondent presents a number of arguments in support of his claim that *ex parte* discussion is permissible under the *Rules* and supported by public policy. Respondent's arguments emphasize conservation of medical and legal resources.

Through adoption of *Rule 56.01(f)(2)* this Court has encouraged informal discovery and discovery at the least expensive level when such discovery is accomplished by the agreement of the parties. In the case now before the Court, however, the patient has objected to *ex parte* discussion. The question, then, is whether the trial court possesses authority to compel the patient to authorize *ex parte* discussion.

Prior to the nineteenth century, in preparation for trial, parties to a lawsuit employed nothing more than mere speculation regarding the adversary's strategy. *See generally, State ex rel. Schlueter Mfg. Co. v. Beck*, 337 Mo. 839, 85 S.W.2d 1026, 1030 (banc 1935); Note, *"Developments in the Law–Discovery,"* 74 HARV.L.REV. 940, 946 (1961); Richardson, *"Should the Scope of Pre-trial Discovery be Expanded,"* 14 J.MO.BAR 8, 12 (1958). At common law, neither party could be required to disclose his case prior to trial. The chancery courts, meanwhile, developed a procedure through which parties might frame issues and discover facts. Note, 74 HARV.L. REV. at 947. Subsequently, a party to an action at law was permitted to secure the benefit of devices developed in chancery by bringing a bill of discovery alleging the need of chancery's assistance in prosecuting effectively the legal claim. *Id.* The reach of the bill of discovery was nevertheless limited by the fact that it was designed to obtain the evidence needed to support one's own case; the bill seldom allowed discovery of the other party's claims, defenses or evidence. Richardson, 14 J.MO.BAR at 12.

From early in Missouri's history, however, the statutory grant of various discovery devices, including the right to take depositions and the right to inspection of documents, superseded equitable discovery. *Schlueter*, 85 S.W.2d at 1030; Richardson, 14 J.MO.BAR at 12. The legislature also authorized interrogatories. *Id.* With the adoption of the Field Code in Missouri in 1849, the scope of statutory discovery was broadened to permit a litigant to explore more freely the adversary's case. *Id.* By court interpretation, however, discovery remained limited by the principle that disclosure be confined to evidence which would be admissible at trial. Richardson, 14 J.MO.BAR at 13. In Missouri discovery under the *Rules* subsequently superseded discovery under statute where the *Rule* is inconsistent with statute. *Rule 41.02.* Discovery has evolved, therefore, as a right conferred or granted under the authority of the legislature or the court.

Under current practice, the purposes of discovery are to eliminate concealment and surprise, *Combellick v. Rooks*, 401 S.W.2d 460, 464 (Mo. banc 1966), to assist litigants in determining facts prior to trial, *Bethell v. Porter*, 595 S.W.2d 369, 377 (Mo.App. 1980), and to provide litigants with access to proper information through which to develop their contentions and to present their sides of the issues as framed by the pleadings. *State ex rel. Anheuser v. Nolan*, 692 S.W.2d 325, 328 (Mo.App.1985). The need for discovery, however, must be balanced against the burden and intrusiveness involved in furnishing the information. *Id.*

Determination of the limits of authorized discovery in the State of Missouri commences with *Rule 56*. *Rule 56.01(a)* provides in pertinent part:

(a) Discovery Methods. Parties may obtain discovery by one or more of the following methods: depositions upon oral examination or written questions; written interrogatories; production of documents of things or permission to enter upon land or other property, for inspec-

tion and other purposes; physical and mental examinations; and requests for admission.

*Rule 56.01(b)* provides in pertinent part:

(b) Scope of Discovery. Unless otherwise limited by order of the Court in accordance with these Rules, the scope of discovery is as follows:

(1) *In General.* Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents or other tangible things and the identity and location of persons having knowledge of any discoverable matter.

*Rule 56.01(b)(4)* provides in pertinent part:

(4) *Trial Preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this Rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

(a) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial and to state the general nature of the subject matter on which the expert is expected to testify.

(b) A party may discover by deposition the facts and opinions to which the expert is expected to testify.

Although, as respondent notes, the *Rules* do not expressly forbid *ex parte* discussion, neither do the *Rules* expressly authorize such discussion as a method of discovery. *Rule 41.04* states that "[i]f no procedure is specially provided by rule, the court ... shall proceed in a manner consistent with the applicable statute, or statutes, if any, and precedent...." Although not precisely on point, *Rule 41.04* guides the court's analysis where the proposed procedure is not specially provided by rule.

The absence of explicit authority in the *Rules* leads necessarily in this case to a re-examination of the confidential and fiduciary relationship existing between a patient and the patient's physician, for it is the potential burden and intrusiveness involved in the physician's furnishing the information that is to be balanced against the need for and stated purposes of discovery. *See State ex rel. Anheuser v. Nolan,* 692 S.W.2d at 328. .

In § 491.060, RSMo 1986, the legislature established a privileged relationship between physician and patient:

The following persons shall be incompetent to testify: ... (5) A physician or surgeon, concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon.

The purpose of the physician-patient privilege is to enable the patient to secure complete and appropriate medical treatment by encouraging candid communication between patient and physician, free from fear of the possible embarrassment and invasion of privacy engendered by an unauthorized disclosure of information. *See, e.g., Petrillo v. Syntex Laboratories, Inc.,* 148 Ill. App.3d 581, 102 Ill.Dec. 172, 187, 499 N.E.2d 952, 967 (1986), *appeal denied,* 113 Ill.2d 584, 106 Ill.Dec. 55, 505 N.E.2d 361, *cert. denied sub nom. Tobin v. Petrillo,* 483 U.S. 1007, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987); *Stempler v. Speidell,* 100 N.J. 368, 495 A.2d 857, 860 (1985); *Nelson v. Lewis,* 130 N.H. 106, 534 A.2d 720, 722 (1987).

The public policy evidenced by the statutory privilege is also reflected in the code of ethics and professional conduct to which physicians must adhere to gain and retain medical licensure in the State of Missouri. *See* § 334.100.2, RSMo 1986. The code of ethics for the medical profession includes the Hippocratic Oath, the purpose of which is to promote full disclosure. Similarly, as the *Stufflebam* court recognized, Principle

IV of the American Medical Association's *Principles of Medical Ethics* states:

A physician shall respect the rights of patients, of colleagues, and of other health professionals, and shall safeguard patient confidences within the constraints of the law.

Finally, § 5.05 of the Current Opinions of the Judicial Council of the American Medical Association (1984) states:

The information disclosed to a physician during the course of the relationship between physician and patient is confidential to the greatest possible degree.... The physician should not reveal confidential communications or information without the express consent of the patient, unless required to do so by law.

*Stufflebam,* 694 S.W.2d at 886. A physician has a clear ethical obligation, therefore, to keep confidential the information gained in the course of medical treatment.

The physician-patient privilege, however, is not absolute. Under certain circumstances, the protection afforded by the privilege must give way to society's interest in ascertaining the truth. In *McNutt v. Keet,* 432 S.W.2d 597 (Mo. banc 1968), this Court held that when a patient places his or her physical condition in issue under the pleadings, the patient will be considered to have waived the statutory privilege "so far as information from doctors or medical and hospital records *bearing on that issue* is concerned." *McNutt,* 432 S.W.2d at 601 (emphasis added). The patient constructively consents to the disclosure of pertinent medical information that would otherwise be confidential. The *McNutt* court in effect struck a balance between society's interest in maintaining the confidential relationship between patient and physician and society's interest in discovery of truth in a civil lawsuit.

After *McNutt,* however, this Court continued strongly to affirm the importance of the underlying confidential and fiduciary relationship of physician and patient. In *State ex rel. McCloud v. Seier,* 567 S.W.2d 127 (Mo. banc 1978), defendant moved that plaintiff be ordered examined for defen-

dant's purposes by plaintiff's treating physician. The patient objected. Finding that a constructive waiver of the statutory privilege does not terminate all effects of the physician-patient relationship, this Court held the patient could not be required to submit to the examination. *McCloud,* 567 S.W.2d at 128. The physician's ethical obligations continue, as do the physician's fiduciary obligations. *Id.* Although the patient is deemed to have waived the statutory privilege with regard to certain information, the ongoing confidential and fiduciary relationship between physician and patient continues to require protection from conduct that might jeopardize the sanctity of that relationship. *See McCloud,* 567 S.W.2d at 128. As a function of the physician-patient statutory privilege and the physician's code of ethics, the public has an affirmative right to rely on the physician to protect the confidences revealed in the course of treatment. *Id.* "A physician occupies a position of trust and confidence as regards his patient—a fiduciary position. It is his duty to act with the utmost good faith. This duty of the physician flows from the relationship with his patient and is fixed by law...." *Moore v. Webb,* 345 S.W.2d 239, 243 (Mo.App.1961).

Whether the *Rules* permit a court to enlarge the constructive waiver of the privilege turns on the question of the balance to be struck between the interest in preserving the physician-patient confidential and fiduciary relationship and the interest in achieving the purposes of discovery.

Jurisdictions that have addressed the issue are divided as to the appropriate answer. Numerous jurisdictions have held that the burden placed on defendants by having to use formal discovery as specially authorized under the *Rules* is outweighed by society's interest in preserving the underlying confidential and fiduciary relationship between physician and patient. *See Loudon v. Mhyre,* 110 Wash.2d 675, 756 P.2d 138 (1988); *Alston v. Greater S.E. Community Hosp.,* 107 F.R.D. 35 (D.D.C. 1985); *Petrillo v. Syntex Laboratories, Inc.,* 148 Ill.App.3d 581, 102 Ill.Dec. 172, 499 N.E.2d 952; *Roosevelt Hotel Ltd. Part-*

*nership v. Sweeney*, 394 N.W.2d 353 (Iowa 1986); *Wenninger v. Muesing*, 307 Minn. 405, 240 N.W.2d 333 (1976); *Smith v. Ashby*, 106 N.M. 358, 743 P.2d 114 (1987); *Nelson v. Lewis*, 130 N.H. 106, 534 A.2d 720; *Anker v. Brodnitz*, 98 Misc.2d 148, 413 N.Y.S.2d 582 (Sup.Ct.), *aff'd mem.*, 73 A.D.2d 589, 422 N.Y.S.2d 887 (App.Div. 1979), *appeal dismissed*, 51 N.Y.2d 743, 432 N.Y.S.2d 364, 411 N.E.2d 783 (1980).

In addition to the Missouri Court of Appeals, Southern District, holding in *Stufflebam*, a number of other courts have approved *ex parte* contact. *See Doe v. Eli Lilly & Co., Inc.*, 99 F.R.D. 126 (D.D.C. 1983); *Trans–World Inv. v. Drobny*, 554 P.2d 1148 (Alaska 1976); *Green v. Bloodsworth*, 501 A.2d 1257 (Del.Super.Ct.1985); *Stempler v. Speidell*, 495 A.2d 857. It is the rule of these cases upon which respondent relies.

Respondent argues that *ex parte* discussion is not expressly prohibited by the *Rules.* As the previous discussion demonstrates, however, the mere silence of the *Rules* is not determinative. A public policy assessment is required to resolve the question. *See Petrillo*, 102 Ill.Dec. at 186–87, 499 N.E.2d at 966–967.

Respondent also contends that *ex parte* discussion not only furthers the search for the truth but also leads to the conservation of both medical and legal resources. Respondent submits that *ex parte* discussion is an efficient and cost-effective way to eliminate nonessential witnesses and encourages the early evaluation and settlement of cases and a corresponding conservation of resources. Respondent further argues that *ex parte* discussion requires less preparation than formal discovery methods, is easier to schedule, is less time consuming, and allows for a "spontaneity and candor" that is not available under the formal discovery methods.

It is not clear that *ex parte* discussion ultimately results in the conservation of resources. The defendant must expend time and effort to prepare the authorization and move for the court order compelling execution. The defendant will spend further time and effort to secure and review the plaintiff's medical records so that the defendant has an intelligent basis upon which to have an *ex parte* discussion with the physician. Simultaneously, the plaintiff must respond to the motions and orders and brief the physician on the limits of permissible disclosure. The physician, in turn, must cull the patient's records, confer with the patient's attorney, and then confer with the defendant's attorney. It is likely that the physician will later be questioned by the plaintiff's attorney about the discussion. Notwithstanding this time and effort, defendant still may deem it prudent to depose the physician.

As for early evaluation and settlement of a case, it is the information obtained, rather than the *ex parte* discussion itself, that leads to resolution. *Petrillo*, 102 Ill.Dec. at 185, 499 N.E.2d at 965. The information obtained by *ex parte* discussion can be obtained through the discovery devices specifically enumerated in the *Rules*, for example, production of documents or depositions upon oral examination or written question. Moreover, there is nothing to prevent plaintiff's counsel from agreeing to an informal interview with both counsel present.

Because the information that may be secured legitimately through *ex parte* discussion may otherwise be obtained, the potential harm to the physician-patient relationship inherent in *ex parte* discussion between the defendant and the plaintiff's treating physician assumes greater relevance. *Petrillo*, 102 Ill.Dec. at 181–82, 499 N.E.2d at 961–962; *Wenninger*, 240 N.W.2d at 336–337. The first and most obvious danger is that the discussion may result in the disclosure of irrelevant, privileged medical information. *Loudon*, 756 P.2d at 140. Respondent asserts that a motion in limine or a protective order pursuant to *Rule 56.01(c)* provides sufficient remedy for abuse or improper disclosure during an *ex parte* discussion. This contention, however, is not persuasive. Assuming the plaintiff can discover the improper disclosure and is able to meet the burden necessary to elicit relief, which may be difficult given that the plaintiff was not present when the alleged misbehavior oc-

curred, relief after the fact cannot realistically restore the patient's trust and confidence in the physician. *Petrillo,* 102 Ill. Dec. at 186, 499 N.E.2d at 966. Pursuit of a protective order, moreover, would likely become a matter of course, forcing the courts into supervision of every *ex parte* discussion and creating additional questions regarding whether *ex parte* discussion in fact conserves resources. *See Loudon,* 756 P.2d at 141.

In addition, *ex parte* discussion creates an opportunity for the consideration of extrinsic matters that may subtly compromise a physician's duty of loyalty to the patient:

> This court will not overlook the current concerns in the medical malpractice insurance industry and the attitudes of physicians and carriers alike. An unauthorized *ex parte* interview could disintegrate into a discussion of the impact of a jury's award upon a physician's professional reputation, the rising cost of malpractice insurance premiums, the notion that the treating physician might be the next person to be sued, and other topics which might influence the treating physician's views. The potential for impropriety grows even larger when defense counsel represents the treating physician's own insurance carrier and when the doctor, who typically is not represented by his personal counsel at the meeting, is unaware that he may become subject to suit by revealing the plaintiff/patient's confidences which are not pertinent to the pending litigation.

*Manion v. N.P.W. Medical Center of N.E. Pa., Inc.,* 676 F.Supp. 585, 594–595 (M.D. Pa.1987).[1] The statement of these concerns is intended solely to illustrate the difficult position in which physicians and attorneys are placed through conduct of *ex parte* discussion and to make clear that the participation of the plaintiff's counsel in any discussion between the defendant and the plaintiff's physician may be essential to allay the patient's (and the physician's) fears that the physician will disclose irrelevant confidential material or that the fiduciary relationship will be harmed. *Loudon,* 756 P.2d at 141; *Wenninger,* 240 N.W.2d

at 337. The significance of the confidential relationship requires that protection be rendered before the physician-patient privilege is compromised. *Karsten v. McCray,* 157 Ill.App.3d 1, 109 Ill.Dec. 364, 372, 509 N.E.2d 1376, 1384, *appeal denied,* 117 Ill.2d 544, 115 Ill.Dec. 400, 517 N.E.2d 1086 (1987). The *Rules* afford the protection by confining the trial court to compelling interaction between defense counsel and plaintiff's treating physician only within the discovery methods specifically enumerated which, in every instance, require the participation of plaintiff's counsel.

Respondent's policy arguments are not without merit. In balancing the interests involved, however, this Court will not require that a non-enumerated discovery method be added to those already available under the *Rules.* Information or evidence that can be obtained legitimately through *ex parte* discussion can also be obtained through the methods of discovery listed in the *Rules.* Any burdens caused defendants by being restricted to the specially enumerated discovery procedures are outweighed by the potential risks to the physician-patient relationship in deviating from those procedures.

The trial court entered an order requiring relator to execute medical authorizations allowing the defendants to have *ex parte* discussion with relator's treating physicians. This Court holds that respondent lacked authority under the *Rules* to make such an order. To the extent that *Stufflebam* sanctioned court authorized *ex parte* discussion under the *Rules,* it is abrogated.

The preliminary writ of prohibition is made absolute.

BLACKMAR, C.J., and ROBERTSON, RENDLEN, HIGGINS and BILLINGS, JJ., concur.

WELLIVER, J., dissents.

---

1. Even the courts which have permitted *ex parte* interviews recognize that a doctor cannot be required to submit to the interview. *See Alston,* 107 F.R.D. at 38 (D.D.C.1985).